FILED

07/03/2018

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 28, 2018 Session

## STATE OF TENNESSEE v. LEE HAROLD CROMWELL

**Appeal from the Circuit Court for Anderson County**
**No. B6C00016      Paul G. Summers, Senior Judge**

_____

### No. E2017-01320-CCA-R3-CD

_____

The defendant, Lee Harold Cromwell, was convicted of one count of reckless vehicular homicide and eight counts of reckless aggravated assault against nine different victims. The trial court sentenced the defendant as a Range I, standard offender and imposed an effective twelve-year sentence. On appeal, the defendant argues the evidence was insufficient to support his convictions for reckless aggravated assault and challenges various aspects of the jury instructions. The defendant also argues the trial court erred in not merging his eight aggravated assault convictions into his vehicular homicide conviction. Finally, the defendant generally challenges the trial court's sentencing determinations and asserts the cumulative effect of the errors alleged rendered his trial unfair. After our review, we affirm the evidence was sufficient to support the defendant's convictions and the trial court properly sentenced the defendant, but conclude the trial court committed reversible error in instructing the jury as to reckless aggravated assault. Therefore, we vacate the defendant's eight convictions for reckless aggravated assault and remand this case to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part; Case Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Tom Marshall (on appeal), Clinton, Tennessee, and James K. Scott and John DuPree (at trial), Knoxville, Tennessee, for the appellant, Lee Harold Cromwell.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Dave S. Clark, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

*I.    Trial*

After a fireworks show on July 4, 2015, in Oak Ridge, Tennessee, the defendant reversed his truck through a crowded parking lot, killing one victim and injuring eight others.  An Anderson County Grand Jury indicted the defendant for seventeen crimes, including one count each of vehicular homicide, criminally negligent homicide, reckless homicide, reckless endangerment with a deadly weapon, and driving on a suspended or revoked license, and twelve counts of reckless aggravated assault.  Prior to trial, the State dismissed the criminally negligent homicide, reckless homicide, reckless endangerment with a deadly weapon and reckless aggravated assault in which James Robinson was the victim, and three additional counts of reckless aggravated assault. The trial court severed the driving on a suspended or revoked license charge.  As a result, the State proceeded to trial against the defendant for one count of reckless vehicular homicide for the death of James Robinson (Count 1), and eight counts of reckless aggravated assault for injuries to victims Julia Robinson (Count 2), Jade Robinson (Count 3), Jacklyn Robinson (Count 4), Elizabeth Eldridge (Count 5), Michael Eldridge (Count 6), Curtis Booker (Count 7), Ja'Taalia Henderson (Count 8), and La'Ruis Henderson (Count 9).  At trial, the State presented the following facts for the jury's review.

Melody Cody watched the fireworks show in her white Ford Thunderbird from the parking lot of the Midtown Community Center in Oak Ridge on July 4, 2015.  At the end of the show, Ms. Cody saw a red pick-up truck reversing "very slow[ly]" towards her vehicle.  She realized the truck was going to hit her vehicle because as the truck reversed, it "[was] still angling toward [her] car instead of straightening up."  Upon impact, the truck knocked the "rear view mirror off the side door," stopped "for a few seconds," and then "accelerated back continuing in reverse all the way down the side of [her] car."  Ms. Cody believed she "was just in the wrong place at the wrong time," but "heard crashes of [the truck] obviously impacting other cars."

Michael and Elizabeth Eldridge sat on the tailgate of their Ford F-150 and watched the Oak Ridge fireworks show on July 4, 2015.  At the end of the show, the parking lot was "[h]eavily congested," and Mr. Eldridge noticed "everybody was sitting still except for one vehicle," a "cranberry colored pickup truck."  The truck, driven by the defendant,

"had pulled in blocking a lot of folks from exiting." Mr. Eldridge soon saw the defendant's truck "slowly easing backwards in reverse." The defendant "sideswiped" a Ford Thunderbird and then stopped for "[a] few seconds." The defendant then continued reversing and sideswiped a van, stopping again "for a few seconds."

After hitting the Thunderbird and the van, the defendant then "floored it." Mr. Eldridge saw the defendant "accelerate[] extremely heavy. As hard as you could accelerate." He "saw [the defendant] cut his wheel and come right toward [them]." Mr. Eldridge tried to raise his legs from the tailgate to avoid being hit, but the rear of the defendant's truck "hit [his] left knee and put a seven-inch gash in [his] knee and sent [him] flying through the air. [Mr. Eldridge] struck the back of [his] cab and fell into [his] truck." Mrs. Eldridge was knocked towards the cab of the truck, injuring her ankle and leaving her "a little bit sore." The defendant "continued on," hitting multiple vehicles before finally stopping. When the defendant finally stopped, Mr. Eldridge saw the body of James Robinson underneath the defendant's truck with "blood coming out of his mouth."

Mr. Eldridge described the scene left in the defendant's wake as "a horror movie." After receiving medical attention for his left knee, he heard the motor revving from the defendant's truck. Mr. Eldridge walked towards the truck, saw the defendant sitting in the driver's seat, and asked "why did you do this?" The defendant "stuck his head out the window and he said 'my accelerator stuck.'" Mr. Eldridge asked the defendant if he was "going to stick with that story," and then walked away. Regarding his comment to the defendant, Mr. Eldridge explained on cross-examination,

> When I heard him revving his motor, and he made the statement to me that the accelerator stuck that just told me it didn't stick because he was revving his motor. So, that's how I drew the conclusion and made the statement "and you are going to stick with that story?"

Julia Robinson attended the fireworks show with her husband, James Robinson, her daughters, Jade and Jacklyn Robinson, and her cousin, Morticia Corey. Her family watched the fireworks from the back of their vehicle with the back hatch open and the third row of seats folded down. After the show, Mr. and Mrs. Robinson were at the back of their vehicle near the hatch when the "whole car got knocked." Mrs. Robinson "hit the rails and the doors of [her] car," hit another car, and "then bounced back into [her] car." She suffered a "[s]evere concussion" and numbness in her legs. She obtained a scar near her left eye, and her "whole face swelled and bruised." Jacklyn complained that her neck and shoulder hurt, while Jade was "laying on her back on the ground . . . with her hands in fists," crying.

Before EMTs arrived, Mrs. Robinson found her husband "laying . . . on his side in like a fetal position underneath the car." EMTs removed Mr. Robinson's body from the scene. Mrs. Robinson, Jacklyn, and Jade were later transported to the hospital where both girls were checked for concussions. Neither child obtained any permanent injuries.

Jade and Jacklyn Robinson both testified at trial. On July 4, 2015, Jade was nine years old and Jacklyn was seven years old. After the fireworks ended, Jade saw her father running towards her, and then her "head went banging against the [car] doors." She "ping pong[ed] against the [car] doors," fell, and injured her head and bruised her legs. Jade did not see what happened to her father because she "closed [her] eyes and hoped that it would [] go away." When she opened her eyes, she "saw a black truck and [she] saw [her] dad's hand under it." Jacklyn stated she watched the fireworks show in the trunk of their family vehicle. After the show, as "[t]he car came in," her father pushed her inside the vehicle "so [she] wouldn't get hurt." She did not remember exactly how the impact occurred, but remembered "getting trapped in." The impact left Jacklyn with scrapes and her neck and shoulder hurt.

Janica Henderson attended the fireworks show with her children, Ja'taalia Henderson, La'Ruis Henderson, La'miere Porter, and Ja'shalin Porter. She parked next to the Robinsons' vehicle during the show. Afterwards, Ms. Henderson got in the driver's seat and her four children got in the backseat. She then "heard a boom and [she] saw . . . Ja'taalia like shifting over in the back seat." Ms. Henderson injured her back upon impact, requiring "a little therapy." Ja'taalia began "vomiting and shaking." La'Ruis "had a scratch on his nose and it was bleeding by the time he was out of the car." Ms. Henderson admitted she did not see the defendant's truck hit her car, but noted "[w]hen I got out of the car, my car was kind of sideways to the Robinson[s'] car and the red truck was right behind both of our cars." Ms. Henderson then realized Mr. Robinson "was underneath the car."

Curtis Booker, another victim, watched the fireworks show and then heard "some tires screeching." Mr. Booker saw the defendant's truck coming towards him, forcing Mr. Booker to "dart[] in the middle of the cars [be]cause [he] was in the middle of the road and [he] didn't have [any]where to go." He jumped in the air, but the defendant's truck "just kept coming. Hitting car after car." The defendant hit Mr. Booker with his truck, causing Mr. Booker to hit Ms. Henderson's vehicle and fall to the ground. He bruised his hips and felt sore. Mr. Booker saw the defendant's truck hit the Robinsons' vehicle, and then saw Mr. Robinson lying on the ground underneath the defendant's truck.

- 4 -

Kai'reese Pendergrass heard the defendant's truck "screech[]" and saw it reverse through "the parking lot at a pretty high speed." She saw the truck hit a white car and then stop for "[m]aybe two or three seconds." Ms. Pendergrass saw the defendant in the driver's seat and "told him to stop and tried to get him to stop the car from moving." After hitting the white car, however, the defendant "seemed as if he went back into a shock and his foot went back on the gas." Ms. Pendergrass saw the defendant's truck "start to screech and flew back again" hitting "a bunch of cars." During cross-examination, Ms. Pendergrass stated the defendant seemed "[s]cared and distressed like he really didn't feel in the right position."

Officer Benjamin Higgins of the Oak Ridge Police Department responded to the chaotic scene in the Midtown Community Center parking lot. As he approached, Officer Higgins noticed three or four vehicles "that had been wrecked," and he saw the body of James Robinson "underneath a maroon Dodge pick-up truck." Mr. Robinson "appeared to be unconscious, lying in what appeared to be a pool of his own blood."

Officer Higgins approached the defendant who was sitting calmly in the driver's seat of his truck. The truck was damaged and located "up against" another damaged vehicle. Officer Higgins asked the defendant for his driver's license. Instead, the defendant provided an expired Tennessee Valley Authority identification card. When asked about the damage he caused, the defendant explained "he was slowly backing up and that all of a sudden his throttle stuck and he lost control of the vehicle." The defendant did not appear to have any physical injuries, but advised he was diabetic. As a result, EMTs examined the defendant, noting his blood sugar read 168. Because of the chaotic nature of the scene, the defendant remained in his truck and was unable to complete field sobriety tests. However, after conducting a blood test, Officer Higgins determined no alcohol or drugs were involved, and the defendant was not charged with any crimes on July 4, 2015.

Officer Scott Carroll responded to the scene after receiving a call that there "was possibly a male trapped under [a] vehicle." Officer Carroll arrived to a "chaotic" scene and tried to locate the injured victim. As he made his way through the crowd, Officer Carroll saw Mr. Robinson underneath the defendant's truck, "laying face down in [a] pool of his own blood." It was clear Mr. Robinson suffered significant head trauma as he was "gasping for air" and was not responsive. Officer Carroll attempted to relieve the fluid building up inside Mr. Robinson until EMTs arrived on the scene.

Officer Carroll saw Mr. Eldridge on the scene, stating "he had some scuffs on his legs where his legs had gotten between the tailgate of his truck and also the striking vehicle." Additionally, Officer Carroll spoke to the defendant, noting the defendant's

calm demeanor and that the inside of his truck was "pretty clean" with only "a few papers in the floor." Officer Carroll did not inspect the floor mats in the defendant's truck, and he was unaware of any alcohol or drugs in the defendant's system or of the defendant's speed during the impacts.

Officer Matthew Johnston conducted the search warrant of the defendant's vehicle and transported it to Secret City Chrysler on July 13, 2015. He explained "[t]he purpose of the vehicle being taken to Secret City was for a mechanical inspection to be done [by] a certified [D]odge mechanic." Officer Johnston photographed the defendant's truck and the parts of the truck examined by the mechanic at Secret City Chrysler, copies of which were entered into evidence. After the inspection, "[t]he items were placed back on the vehicle and [the] vehicle was placed back into evidence in our impound lot."

David Carey, an expert in the field of general automotive mechanics, inspected the defendant's truck at Secret City Chrysler on July 13, 2015. Mr. Carey was told "to inspect the [truck for] anything that could have caused the throttle to stick open." In doing so, he checked to see if any wires were torn and checked for fault codes in the truck's computer system, finding nothing wrong with either. Regarding his inspection, Mr. Carey explained:

> I was inspecting for any frayed wires, cables -- anything disconnected and saw nothing out of place or out of the ordinary[,] went and finished up taking in taking (sic) the air filter assembly off and at that point[,] I actuated the throttle mechanism which has a cable connected to the gas pedal. It moved freely. There was nothing binding or sticking and I got a flash light and looked down inside the throttle body and out the actuated it again. Nothing was binding or sticking. There wasn't no (sic) excessive amount of carbon or anything built up on there that say would have caused a problem.

After reviewing photographs of the defendant's throttle body assembly and parts at trial, Mr. Carey opined there was "no evidence whatsoever" that the defendant's throttle plate stuck open on July 4, 2015. He explained if a throttle plate stuck open and the truck was in gear, "the motor would rev up and the car would take off." However, Mr. Carey found no evidence this occurred in the defendant's truck. He further opined the defendant's throttle body functioned properly, stating the throttle body "moved completely freely" and he "saw nothing . . . out of the ordinary." On July 21, 2015, Mr. Carey performed a second inspection of the defendant's truck, again determining no mechanical defects existed.

- 6 -

During cross-examination, Mr. Carey stated he found nothing wrong with the defendant's truck that would have caused it to accelerate inadvertently on July 4, 2015. Further, he explained, "[t]hat was the purpose of doing the electronic test before I did any of the mechanical inspection. If there was an electronic problem that would cause that, it would have showed up in that test and there was nothing." When asked about recalls for Chrysler vehicles, Mr. Carey stated he has "never heard of an unintended acceleration recall repair." Finally, Mr. Carey explained he did not receive a request to preserve the machine used to test the fault codes in the defendant's vehicle, explaining the machine that reads the fault codes does not "hold a recording of what you looked at[,] it just reads it."

Christopher Lochmuller, an expert in the field of forensic pathology, performed the autopsy of James Robinson. He explained Mr. Robinson died from being struck by a vehicle. Specifically, the impact Mr. Robinson suffered left his skin scraped and bruised with two impact points on the inside of his right knee and the outside of his left knee. Mr. Robinson suffered "a number of broken ribs on . . . the front part of his chest on both sides." Significantly, the impact tore Mr. Robinson's aorta and damaged his spine. Dr. Lochmuller explained, "the upper portion of [the aorta] in the left side of the chest had two tears in it so it was torn through and with bleeding into both sides of the chest as well as there was bleeding within the tissue surrounding the aorta in the chest." Regarding Mr. Robinson's spinal injury, Dr. Lochmuller stated:

> So the upper portion of his neck -- the actual spine itself -- at autopsy there was instability there that I could feel there when I palpated the neck. What that indicates is the ligaments in that area that keep the spine together were torn which allowed the bone to shift and then bruise the upper spinal cord which indicated at the autopsy it was soft so it had been compressed. So he has a compression-type injury to the upper portion of his spinal cord which would make you potentially paralyzed immediately from the neck down. In addition to that, something that can happen is you can go into what we call neurogenic shock. When your cord is injured up high like that your blood vessels lose the resistence (sic), the tone that keeps your blood pressure up in your body. So you can go into something called neurogenic shock; so that injury in it of itself can also be fatal.

Dr. Lochmuller stated Mr. Robinson's injuries, which led to his death, were consistent with someone being struck by a vehicle. Regarding the type of impact Mr. Robinson suffered, Dr. Lockmuller testified: "It's not someone who's just slowly backing up out of a parking space. I cannot give you a specific speed, but this is not someone who just gets bumped and falls down like that. It's just . . . it's more than that." The State then rested.

The defendant presented proof from James Norris, an expert in the area of accident reconstruction. Mr. Norris examined the defendant's truck on November 22, 2016. He opined the floor mat on the driver's side of the defendant's truck "shifted forward" on July 4, 2015. Upon his inspection, however, Mr. Norris noted the driver's side floor mat "was in its normal location or what would be identified as a normal location because there [was] a hook that actually was protruding through a grommet in the mat to hold it in place." Regarding the change in the position of the floor mat, Mr. Norris stated the position of the floor mat on July 4, 2015 was not preserved, noting "[s]omething must have changed them is the only thing I can say. I can't say how or when."

After investigating the defendant's case, Mr. Norris opined that "this accident is consistent with an unintended acceleration event." He stated, "I believe and it's my opinion that with a reasonable degree of engineering certainty that this accident was an unintended acceleration. Primary cause if there was no mechanical issue would be pedal confusion, a human factor." In support of his opinion, Mr. Norris explained, "across the spectrum there have been many different makes and models over the years that Chrysler has had to either have recalls on or at lease (sic) do investigations on in terms of unintended accelerations." He referenced a past Chrysler issue where "[t]hey were fined . . . seventy million for failure to report some safety concerns," including issues with "air bag inflators, seat belt issues, [and] throttle stickings." During cross-examination, however, Mr. Norris stated Chrysler did not recall the throttle on the defendant's truck. Additionally, Mr. Norris admitted he did not inspect the throttle of the defendant's truck, but rather relied on Mr. Carey's testimony, that the defendant's throttle did not stick, in reaching his expert opinion.

At the close of the defendant's proof, the jury convicted the defendant as charged, and the trial court held a subsequent sentencing hearing on June 19, 2017.

II. *Sentencing Hearing*

At the sentencing hearing, the State introduced the presentence report into evidence through probation officer Wayne Langley of the Tennessee Department of Correction. The report included victim impact statements from Julia Robinson and Michael Eldridge, noted the defendant believed his mental health was "excellent" and his physical health was "good," and outlined the defendant's behavior after his convictions. According to Officer Langley and the report, the defendant filed liens against several public officials involved in his case. He also claimed his trial counsel "did not know that this proceeding was an admiralty jurisdiction." The defendant told Officer Langley he asked his trial counsel "over and over to challenge the jurisdiction" because "[t]he

admiralty jurisdiction stops at the high water mark of the land." Officer Langley also noted the defendant maintained a low likelihood of reoffending.

Officer Higgins testified to his interactions with the defendant on July 4, 2015. After asking the defendant for his driver's license, proof of insurance, and registration, the defendant provided him with "an expired TVA ID." The defendant stated he did not have a valid driver's license and instead, "handed [Officer Higgins] a packet that basically stated that he demanded all his rights at all times and that he didn't need a driver's license to be traveling per se." The information packet indicated the defendant identified as a sovereign citizen, and the defendant confirmed the same. Officer Higgins stated the defendant's driver's license was suspended by the Oak Ridge City Court for failure to pay a speeding ticket. In addition, Officer Higgins noted the defendant filed an $8 million lien against him after being convicted.

Dwayne Collins of the Department of Safety and the Office of Homeland Security explained his role in training Tennessee law enforcement officials in how to interact with individuals who identify as sovereign citizens. According to Mr. Collins, sovereign citizens believe "the government is a corrupt government and has no jurisdictional boundaries to them." Additionally, sovereign citizens do not have a driver's license because "they traverse in a vessel" and do not believe that law applies to them. Mr. Collins explained sovereign citizens, in retaliation to law enforcement, will often file liens against officials at the register of deeds office, despite the illegality of the filing. During cross-examination, Mr. Collins explained sovereign citizens do not follow a central ideology and he has not seen any legitimate liens filed by sovereign citizens.

Special Agent Mark Irwin of the Tennessee Bureau of Investigation reviewed the liens filed by the defendant in Davidson County against various public officials involved in various aspects of his criminal case. Agent Irwin stated, "from reading the case file of what he is being sentenced on here today and interviewing each person one-on-one, it appeared to me that he had no legal basis to file these liens on all these professionals." As a result, the defendant was indicted for eight counts of aggravated forgery against eight victims, all of whom were public officials involved in his prosecution.

Upon review by the trial court, Agent Irwin listed the following liens filed by the defendant on March 30, 2016 in the amount of $4 million against the following victims: William T. Jones, Circuit Court Clerk; Roger Miller, Anderson County General Sessions Judge; Dave Clark, Anderson County District Attorney; Victoria Bannach, Assistant District Attorney; James Akagi, Oak Ridge Police Chief; Grant Goyldie, former Oak Ridge police officer; the Oak Ridge Police Department; the Anderson County General Sessions Court; and the Anderson County District Attorney's Office. Additionally, the

trial court reviewed a subsequent set of $8 million liens filed by the defendant on May 17, 2016 against the Anderson County Criminal and Circuit Courts, Officer Higgins, and Anderson County Criminal Court Judge Donald Elledge, in addition to the victims listed above.

Michael Eldridge testified to the impact the defendant's crimes have had on his life since July 4, 2015. Specifically, Mr. Eldridge explained the trouble he has walking as a result of the defendant's truck hitting his left knee and the anxiety he now experiences while driving. In addition to the property damage suffered, Mr. Eldridge stated he and his wife, who still suffers emotionally, face ongoing medical bills as a result of the defendant's crimes.

Julia Robinson also testified to the effect the defendant's crimes have had on her family. Along with ongoing pain, Mrs. Robinson suffered the following injuries as a result of the defendant's crimes:

> Physically I had a scope done on my right knee and it was knocked out of alignment. I have lost . . . I have nerve damage in the calf part of my leg, both legs because of the running board on my car that was hit. I have two bulges in my back, one at the C-5 neck line and the other one between the L-4 and L-5. I will have to handle that with therapy and such.

Aside from her physical injuries, Mrs. Robinson also explained the difficulties she now faces as a single parent to Jade and Jacklyn, who are grieving the loss of their father. Mrs. Robinson stated the death of Mr. Robinson has significantly affected her family both emotionally and financially. Additionally, Mrs. Robinson stated both girls were injured in the crimes, noting Jade suffered from "physical bumps and bruises at the scene," while Jacklyn "had some neck trauma from being thrown, neck [and] shoulder pain."

The defendant's step-daughters, Jennifer Bateson and Melissa Chase, testified on his behalf. Both stated the defendant is a good step-father and feels remorse for the "accident." Neither Ms. Bateson, nor Ms. Chase was aware of the defendant's sovereign citizen ideology. Katie Byers attended church with the defendant and testified he is a "good man." She stated after the defendant's actions on July 4, 2015, he "stood up in front of our church and told the people that he did not mean to hurt [any]body." Clay Donahue, a friend of the defendant's for over forty-five years, stated the defendant was honest and trustworthy and indicated remorse after the July 4, 2015 events. Mr. Donahue testified the defendant "talked to [him] about sovereign citizens," but he did not "recall [the defendant] telling [him] he was a sovereign citizen."

After the defendant's allocution and its consideration of the proof presented, the trial court imposed an effective sentence of twelve years' incarceration. Specifically, the trial court sentenced the defendant as a Range I, standard offender for his nine convictions. The trial court grouped the convictions loosely according to the victims injured in each vehicle hit by the defendant and ran the sentences within each group concurrently to one another, but consecutively to the other groupings. The groups consisted of Counts 1 through 4, Counts 5 and 6, and Counts 7 through 9. The trial court imposed a sentence of five years in Count 1; three years in Counts 2, 3, and 4; three years in Count 5; four years in Count 6; and three years in Counts 7, 8, and 9. Thus, the defendant received an effective five-year sentence for Counts 1 through 4; an effective four-year sentence for Counts 5 and 6; and an effective three-year sentence for Counts 7 through 9. The trial court ran Counts 5 and 6 consecutively to Counts 1 through 4, and ran Counts 7, 8 and 9 consecutively to Counts 5 and 6, resulting in an effective sentence of twelve years. The trial court denied the defendant's motion for new trial, and this timely appeal followed.

## ANALYSIS

### I.  *Sufficiency of the Evidence*

On appeal, the defendant challenges the sufficiency of the evidence as to his eight convictions for reckless aggravated assault. More specifically, the defendant argues the evidence presented at trial was insufficient to support his convictions because (1) the State failed to show he used his truck as a deadly weapon, (2) the State failed to show he was "consciously aware of the risk required for the culpable mental state of recklessness," and (3) the State did not prove bodily injury to the victim in Count 8, Ja'taalia Henderson, claiming he did not suffer bodily injury in that he only vomited after the incident. The State, however, argues the evidence is sufficient to support the defendant's convictions because (1) the defendant "actually used" his truck as a deadly weapon, (2) the jury was permitted to infer the defendant acted recklessly from the proof presented at trial, and (3) Ja'taalia Henderson suffered a temporary illness, vomiting and shaking, following the incident which constitutes bodily injury. Upon our review of the record, it is clear the evidence produced at trial supports the defendant's convictions for reckless aggravated assault.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also*

- 11 -

Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

As charged in Counts 2 through 9 of the indictment, reckless aggravated assault occurs when one "[r]ecklessly commits an assault as defined in § 39-13-101(a)(1), and the assault: [i]nvolved the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(B)(iii). Assault occurs when one "[i]ntentionally, knowingly or recklessly causes bodily injury to another." Tenn. Code Ann. § 39-13-101(a)(1). Reckless behavior is defined, as follows:

> "Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's

standpoint.

Tenn. Code Ann. § 39-11-106(a)(31). A deadly weapon is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5)(B). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2).

Here, the evidence produced at trial shows the defendant injured eight victims by reversing his truck at a high rate of speed through a crowded parking lot on July 4, 2015. Mr. Eldridge saw the defendant hit two vehicles and stop after each impact. The defendant then accelerated his truck in reverse "[a]s hard as you could accelerate." In doing so, the defendant hit the Eldridges' truck, causing both Mr. and Mrs. Eldridge to suffer injuries. Mr. Eldridge received a "seven-inch gash in [his] knee," and Mrs. Eldridge injured her ankle and was sore from the impact. The defendant again "floored it" through the congested parking lot, hitting Ms. Henderson's vehicle and the Robinsons' vehicle. The defendant's impact with Ms. Henderson's vehicle left her requiring therapy, Ja'Taalia Henderson "vomiting and shaking," and La'Ruis Henderson with a bleeding scratch on his nose. The defendant finally stopped upon impact with the Robinsons' vehicle. The final impact left Mr. Robinson underneath the defendant's truck in "a pool of his own blood." He later died from his injuries. Mrs. Robinson suffered a concussion and numbness in her legs. Jade Robinson fell to the ground and suffered "bumps and bruises," while Jacklyn Robinson injured her neck and shoulder. Finally, during the defendant's destruction, the defendant hit Curtis Booker with his truck, leaving Mr. Booker with soreness and bruised hips.

Though the defendant argues the State failed to prove his truck was used as a deadly weapon on July 4, 2015, the evidence produced at trial and outlined above shows otherwise. Not only did the defendant use his truck to injure his victims and damage their property, but the speed at which he accelerated through the crowded parking lot rendered his truck a deadly weapon as evidenced by the injuries and death resulting from the severity of the impacts inflicted by the defendant. It is clear the defendant used his truck as a deadly weapon, resulting in the death of Mr. Robinson and bodily injury to his eight other victims. Tenn. Code Ann. § 39-11-106(a)(5)(B). The defendant is not entitled to relief.

The defendant also alleges Ja'Taalia Henderson's reaction to the impact, vomiting and shaking, does not constitute bodily injury. The defendant argues the State failed to prove a connection between Ja'Taalia's illness and the defendant's behavior. The record, however, shows otherwise. Ms. Henderson testified Ja'Taalia was sitting in the backseat

of her car when the defendant reversed his truck into her vehicle. The impact thrust Ja'Taalia into a new position in the backseat. When he exited the vehicle after the impact, Ja'Taalia "was just vomiting and shaking." In convicting the defendant for reckless aggravated assault against Ja'Taalia, the jury clearly found the defendant caused Ja'Taalia to vomit and shake which qualifies as "physical pain or temporary illness" under the bodily injury statute. Tenn. Code Ann. § 39-11-106(a)(2). The defendant is not entitled to relief.

Regarding the defendant's mental state at the time of his crimes, the evidence produced at trial supports the jury's finding that the defendant acted recklessly. As detailed at trial, the defendant "had pulled in blocking a lot of folks from exiting" before beginning his rampage through the crowded parking lot. The defendant stopped after initially hitting Ms. Cody's vehicle, continued in reverse, hit a van, and then stopped again. Ms. Pendergrass testified she tried to get the defendant to stop, but he refused. After the initial two impacts, the defendant again accelerated in reverse through the parking lot hitting the Henderson and Robinson vehicles. As a result of the repeated impacts inflicted by the defendant, he killed Mr. Robinson and injured Julia Robinson, Jade Robinson, Jacklyn Robinson, Elizabeth Eldridge, Michael Eldridge, Curtis Booker, Ja'Taalia Henderson, and La'Ruis Henderson. The evidence supports the jury's determination that the defendant consciously disregarded the substantial and unjustifiable risk of injuring others by reversing his truck through the congested parking lot. Accordingly, after reviewing the evidence in the light most favorable to the State, we hold that the proof presented at trial was sufficient for a rational trier of fact to find the defendant recklessly committed the aggravated assaults of his eight victims. The defendant is not entitled to relief.

## II.    Jury Instructions

The defendant next lodges several specific complaints regarding the trial court's jury instructions as to reckless aggravated assault, *mens rea*, and inferences. Generally, the defendant's arguments assert the trial court's alleged errors led to non-unanimous jury verdicts and constituted a comment on the defendant's decision not to testify at trial. We will review each of the defendant's claims in turn.

### a.  Reckless Aggravated Assault

The defendant argues the trial court did not follow the pattern jury instruction and misstated the elements for reckless aggravated assault in its preliminary, written, and oral

instructions, leading the jury to convict the defendant of a crime not defined by the law and one he was not charged with by the grand jury.

It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will only be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court 'must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008) (internal quotations omitted)).

In instructing the jury, "[t]he material elements of the charged offense should be described and defined in connection with that offense." *State v. Bowman*, 327 S.W.3d 69, 93 (Tenn. Crim. App. 2009) (citing *State v. Ducker*, 27 S.W.3d 889, 899 (Tenn. 2000); *State v. Cravens*, 764 S.W.2d 754, 756 (Tenn. 1989)). "The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis." *Id.* (citing *Garrison*, 40 S.W.3d at 433-34). Harmless error is an error which does not "affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a).

Regarding reckless aggravated assault, the trial court orally instructed the jury, as follows:

Any person who commits the offense of aggravated assault is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

No. 1, that the defendant intentionally or knowingly caused or attempted to cause bodily injury to the alleged victim; that the defendant intentionally or knowingly committed or attempted to commit an assault against the alleged victim; and -- that's an "or" between those.

- 15 -

No. 1, that the defendant intentionally or knowingly caused or attempted to cause bodily injury to the alleged victim; or that the defendant intentionally or knowingly committed or attempted to commit an assault against the alleged victim; and that the defendant recklessly caused bodily injury to another; and that the defendant used or displayed a deadly weapon.

In its written instructions, the trial court provided the following to the jury:

Any person who commits the offense of aggravated assault is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant intentionally or knowingly caused or attempted to cause bodily injury to the alleged victim;

or

(2) that the defendant intentionally or knowingly committed or attempted to commit an assault against the alleged victim;

or

(a) that the defendant recklessly caused bodily injury to another;

and

(b) that the defendant used or displayed a deadly weapon.

In contrast, the appropriate Tennessee Pattern Jury Instruction for reckless aggravated assault provides:

Any person who commits the offense of aggravated assault is guilty of a crime.

- 16 -

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant recklessly caused bodily injury to another;

and

(2)(a) that the act resulted in serious bodily injury to another;

or

(b) that the act involved the use or display of a deadly weapon.

7 Tenn. Prac. Pattern Jury Instr. TPI - Crim. 6.02.

The defendant argues the trial court erred in its preliminary instructions to the jury because "extremely offensive or provocative contact" cannot form the basis for a reckless aggravated assault conviction as it does not include bodily injury. Regarding the instructions provided at trial, the defendant argues the trial court allowed the jury to convict the defendant for an "attempt to cause bodily injury," which is incorrect under the law for reckless aggravated assault. The defendant also suggests the instruction allowed the jury to consider "another" victim rather than the named victim for the convictions. The defendant argues jury unanimity cannot be assumed based upon these alleged errors of the trial court.

The State asserts the superfluous elements added by the trial court in its instructions were harmless because the substance of the instruction remained, noting the jury had to find the defendant "at least recklessly caused bodily injury" through the use or display of a deadly weapon. In doing so, the State views each of the defendant's arguments and the deficiencies in isolation. When reviewing the adequacy of a jury instruction, however, this Court "should view the instruction in the context of the charge as a whole." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

We conclude that the jury instructions on reckless aggravated assault, when viewed in the context of the charge as a whole, failed to fairly submit the legal issues and misled the jury as to the applicable law. The trial court's oral and written instructions were not consistent with each other, the pattern jury instruction, or the statutory elements for reckless aggravated assault.

- 17 -

Furthermore, our review indicates it was error for the trial court to include "attempt" in its instructions to the jury as to reckless aggravated assault. As our supreme court has stated, "one cannot intend to accomplish the unintended." *State v. Kimbrough*, 924 S.W.2d 888, 892 (Tenn. 1996) (holding attempted felony murder does not exist in Tennessee, noting "it is logically and legally impossible to attempt to perpetrate an unintentional killing"). Thus, "[i]t is impossible to conceive of an attempt where a crime by definition may be committed recklessly or negligently but not intentionally." *Id.* at 891 (Tenn. 1996); *see also State v. Vernon Lamar Bryant*, No. E2002-01234-CCA-R3-CD, 2003 WL 22398460, at *2 (Tenn. Crim. App. Oct. 21, 2003) (holding "the crime of attempted reckless homicide does not exist in Tennessee"). As charged in the indictment, reckless aggravated assault occurs when one recklessly causes bodily injury to another through the use or display of a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(1)(B)(iii). The very definition of reckless aggravated assault requires a completed, reckless act which caused bodily injury to another. It cannot be accomplished through an attempt to cause bodily injury. Further, an attempted reckless assault would require proof the defendant intended to commit an "unintended" act, which is not recognized in Tennessee. *See Kimbrough*, 924 S.W.2d at 892; *Bryant*, No. E2002-01234-CCA-R3-CD, 2003 WL 22398460, at *2. By including "attempt" in its definition, the trial court erred in instructing the jury as to the material elements of the offense of reckless aggravated assault.

We conclude that the jury instructions on reckless aggravated assault were so misleading and confusing that the errors were not harmless beyond a reasonable doubt. Rather, it is clear the trial court committed reversible error in instructing the jury as to the elements of reckless aggravated assault by including attempt, an entirely separate crime, within its definition of the charged offense and, thus, effectively lessening the State's burden of proof. As such, we must vacate the defendant's eight convictions for reckless aggravated assault and remand the case to the trial court for a new trial. Upon remand, we advise the trial court to use the language of Tennessee Pattern Jury Instruction 6.02 in instructing the jury as to reckless aggravated assault.

### b. Mens Rea

Similarly, the defendant argues because the State pursued a reckless theory at trial, the trial court erred in instructing the jury on knowing and intentional acts, claiming it "destroyed the requirement that verdicts be unanimous" and amounted to a comment on the evidence. The defendant also complains "no culpable mental states were described in the instructions on reckless aggravated assault." The State asserts the trial court accurately instructed the jury that a finding of recklessness can be established by a finding of knowing or intentional conduct. The State agrees it pursued a reckless theory

at trial, but contends this did not create a risk of a non-unanimous jury verdict. The State also argues the defendant has waived his issue as to the trial court's failure to include specific instructions on *mens rea* in its instruction on reckless aggravated assault because the defendant failed to request such an instruction at trial. Upon our review, we agree with the State.

In instructing the jury as to the offense of vehicular homicide, the trial court provided the following definitions for reckless, knowing, and intentional behavior:

> "Recklessly" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of a conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

> The requirement of recklessly is also established if it is shown that the defendant acted knowingly or intentionally. "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when a person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. ["]Intentionally["] means that a person acts intentionally with respect to the nature of the conduct or the result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

The defendant asserts the trial court created the risk of a non-unanimous jury verdict by instructing the jury as to intentional, knowing, and reckless behavior. We disagree. "When recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly." Tenn. Code Ann. § 39-11-301(a)(2). As such, "generally, alternative theories, mental states, modes of committing the crime, or means by which the crime was committed may be submitted to the jury without the necessity of precautions to assure jury unanimity." *State v. Hood*, 221 S.W.3d 531, 547 (Tenn. Ct. App. 2006) (quoting *State v. James Clayton Young, Jr.*, No. 01C01-9605-CC-00208, 1998 WL 258466, at *5 n.4 (Tenn. Crim. App. May 22, 1998));

*see also* Tenn. Code Ann. § 40-18-112.[1]  Accordingly, it was not error for the trial court to include the definitions of intentional and knowing behavior in its instructions to the jury regarding the crimes of reckless vehicular homicide and reckless aggravated assault. The defendant is not entitled to relief.

Additionally, the defendant takes issue with the trial court's failure to specifically instruct the jury on *mens rea* for reckless aggravated assault, asserting the trial court only defined the mental states while instructing the jury as to vehicular homicide.  However, as noted by the State, the defendant failed to preserve this argument for appeal as he did not object at trial or include this argument in his motion for new trial.  *See Faulkner*, 154 S.W.3d at 58 (citing *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996) ("An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection."); *see also* Tenn. R. Crim. P. 30(b).  Because the defendant raises this issue for the first time on appeal, it is waived.  Regardless, as explained above, we find no error in the trial court's instruction as to the applicable mental states for the defendant's crimes.  The defendant is not entitled to relief.

### c.  Inferences

The defendant argues the trial court erred in providing the jury with an instruction on inferences, claiming the instruction was a comment on the defendant's decision not to testify at trial.  The defendant further argues the trial court's inference instruction led the jury to "conclude that the defendant had a duty to explain the evidence against him, inferred or otherwise."  More specifically, the defendant argues it was improper for the jury to infer that "without evidence of mechanical defect on the defendant's truck, the jury could conclude that it was the defendant's physical action that caused the accident due to lack of evidence of an asserted defense."  The defendant's argument suggests that because the trial court did not define the available inferences for the jury, the jury was allowed to speculate to the same.  The State, however, contends the trial court provided a proper statement of the law and further asserts no error exists because the trial court specifically instructed the jury to not infer anything regarding the defendant's right not to testify in its instructions.  Upon our review, we again agree with the State.

---

[1]Tennessee Code Annotated section 40-18-112 provides: "Where the intent with which, the mode in, or the means by which, an act is done are essential to the commission of the offense, and the offense may be committed with different intents, in different modes, or by different means, if the jury is satisfied that the act was committed with one (1) of the intents, in one (1) of the modes, or by either of the means charged, the jury shall convict, although uncertain as to which of the intents charged existed, or which mode, or by which of the means charged, the act was committed."

At the conclusion of the trial, the trial court provided the following instruction on inferences to the jury:

Inferences. The court has charged the jury concerning an inference that the jury may make in regard to certain evidence in this case. I should say: The [c]ourt may have or may not have -- I don't really recall but I am going to tell you what an inference is now. However, the jury is not required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by all the evidence in this case warrant the inference which the law permits the jury to draw. The inference may be rebutted by direct or circumstantial evidence or both, whether it exists in the evidence of the state or is offered by the defendant. Although the defendant is not required by law to do so, when the defendant offers an explanation to rebut the inference raised, you should consider such explanation along with all the evidence to determine not only the correctness of the inference, but also the reasonableness of the defendant's explanation. You're not bound to accept either the inference or the defendant[']s explanation. The state must prove beyond a reasonable doubt every element of the offense before the defendant can be found guilty.

The trial court's instruction mirrors the language of Tennessee Pattern Jury Instruction 42.19 and serves as a correct recitation of the applicable law. 7 Tenn. Prac. Pattern Jury Instr. TPI - Crim. 42.19. The defendant is not entitled to relief.

Furthermore, in denying the defendant's motion for new trial, the trial court noted:

It is appropriate for the [c]ourt to give an instruction on inferences that may be drawn from evidence. There was evidence regarding the lack of proof of mechanical failure of the throttle on the [d]efendant's truck. It is completely permissible for a jury to infer that the acceleration was caused by a physical action of the [d]efendant based upon the lack of physical evidence of a defense asserted by the [d]efendant. This instruction was included in the jury instructions without objection by the [d]efendant and is, therefore, waived. The [d]efendant is not entitled to relief on this issue.

As noted by the trial court, the proof presented at trial allowed the jury to infer what caused the defendant to accelerate through the parking lot on July 4, 2014. For example, both the State and the defendant introduced explanations for what caused the acceleration. Because the proof fairly raised the issue of inferences and the trial court

provided a proper instruction on the law, no error exists as to this issue. *See Farner*, 66 S.W.3d at 204 (citing *Garrison*, 40 S.W.3d at 432; *Teel*, 793 S.W.2d at 249). In instructing on inferences, the trial court repeated that the State still "must prove beyond a reasonable doubt every element of the offense before the defendant can be found guilty." As such, we discern no error in the trial court's jury instruction on inferences. The defendant is not entitled to relief.

In addition, the trial court provided the jury with an explicit instruction regarding the defendant's right not to testify. The trial court stated:

> The defendant has not taken the stand to testify as a witness but you shall place no significance on this fact. The defendant is presumed innocent, and the burden is on the state to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf, and his election not to do so cannot be considered for any purpose against him nor can any inference be drawn from such fact.

We presume the jury followed the trial court's instructions. *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001); *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). The defendant is not entitled to relief as to this issue.

### III. *Sentencing Issues*

#### a. *Merger*

The defendant argues his convictions violate double jeopardy and that his reckless aggravated assault convictions "should have been merged into the vehicular homicide conviction since all the counts of the indictment stemmed from one act of driving." The State asserts the defendant's convictions do not violate double jeopardy because the defendant injured eight separate victims in each of the eight reckless aggravated assault convictions, and a separate victim was at issue in the vehicular homicide conviction. Additionally, the State asserts the convictions pass the *Blockburger* test because vehicular homicide and reckless aggravated assault require proof of different elements. *State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012) (explaining the approach Tennessee courts should take in applying *Blockburger v. United States,* 284 U.S. 299, 304 (1932)). Upon our review, we agree with the State's assessment of the defendant's claims.

The right against double jeopardy ensures "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Here, the jury convicted the defendant of reckless vehicular homicide for the death of James Robinson.

In addition, the jury convicted the defendant of eight counts of reckless aggravated assault for injuries to Julia Robinson, Jade Robinson, Jacklyn Robinson, Elizabeth Eldridge, Michael Eldridge, Curtis Booker, Ja'Taalia Henderson, and La'Ruis Henderson. This Court has previously determined "that the number of victims is a proper unit of prosecution for aggravated assault; therefore, multiple convictions for each victim of an aggravated assault do not violate double jeopardy." *State v. Antray Terrill Morrow*, No. W2002-02065-CCA-R3-CD, 2003 WL 22848974, at *2 (Tenn. Crim. App. Nov. 25, 2003), *perm. app. denied* (Tenn. May 10, 2004).

Furthermore, as noted by the State, vehicular homicide and reckless aggravated assault require proof of different elements. Vehicular homicide "is the reckless killing of another by the operation of an automobile, . . . as the proximate result of: [c]onduct creating a substantial risk of death or serious bodily injury to a person." Tenn. Code Ann. § 39-13-213(a)(1). Whereas, in this case, reckless aggravated assault occurs when one recklessly causes bodily injury to another through the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-101(a)(1), -102(a)(1)(B)(iii). "Where each statutory offense includes an element not contained in the other, the offenses are distinct. Where the offenses are distinct under *Blockburger,* the legislature is presumed to have intended to allow the offenses to be punished separately." *Watkins*, 362 S.W.3d at 545-46 (*internal citations omitted*). Because vehicular homicide and reckless aggravated assault require proof of different elements and because each reckless aggravated assault conviction named a separate victim, double jeopardy principles were not violated and merger is not appropriate. The defendant is not entitled to relief.

### b. Imposition of Sentences

The defendant next challenges the trial court's sentencing, arguing there is no evidence in the record to support the statutory factors relied on by the trial court in reaching its determinations. The defendant also suggests the trial court improperly considered the fraudulent liens filed after his convictions in assessing his criminal history and determining him to be a dangerous offender. The State argues the trial court imposed within-range sentences after considering the applicable enhancement and mitigating factors and contends the trial court's consecutive sentencing was proper due to his dangerous offender status which was detailed explicitly in the record. Upon our review, we agree with the State.

When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). This Court also reviews consecutive

sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W. 3d at 707; *Pollard*, 432 S.W.3d at 859-60. The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In imposing a sentence, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the defendant in his own behalf. Tenn. Code Ann. § 40-35-210(b). In addition, the principles of sentencing provide that the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. *See* Tenn. Code Ann. § 40-35-103(2), (4). To provide meaningful appellate review, the trial court must state on the record its reasons for the sentence chosen. Tenn. Code Ann. § 40-35-210(e).

After doing so, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)). The trial court shall consider, but is not bound by, the provision that "[t]he minimum sentence within the range of punishment is the sentence that should be imposed . . . [and] should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors." Tenn. Code Ann. § 40-35-210(c); *Carter*, 254 S.W.3d at 346. A non-exclusive list of mitigating and enhancement factors are provided in Tennessee Code Annotated sections 40-35-113 and -114. The weighing of both mitigating and enhancement factors is left to the trial court's sound discretion, but a trial court's misapplication of a mitigating or enhancement factor will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709.

Further, Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the

statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Pursuant to statute, consecutive sentencing is warranted when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). In imposing consecutive sentences based upon a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn.1999) (stating that the *Wilkerson* findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders).

On appeal, the defendant generally complains the trial court abused its discretion by imposing an "overly harsh" sentence of twelve-years' incarceration for his convictions. The record, however, shows the trial court complied with the purposes and principles of sentencing before imposing an effective twelve-year sentence. Specifically, the record makes clear the trial court imposed within-range sentences for each conviction before determining the defendant was eligible for consecutive sentencing based upon his status as a "dangerous offender." Tenn. Code Ann. § 40-35-115(b)(4). The trial court explained its application of the sentencing principles in reaching its sentencing determinations, as follows:

> In determining the sentence the [c]ourt has considered the evidence presented at the trial of sentencing hearing, the presentence report, the sentence principles embodied that the [c]ourt has already discussed, and arguments made as to alternative sentencing. The nature and characteristics of the criminal conduct involved, the evidence and information offered on enhancing and mitigating factors, statistical information by the Administrative Office of the Courts, the allocution statement made by the defendant on his own behalf. And the defendant's potential for rehabilitation or treatment. The [c]ourt has found and the parties have stipulated that the defendant is a range one standard offender pursuant to Tennessee Code Annotated 40-35-105 with a 30 percent release eligibility date.

> Let's talk about enhancement factors. The [c]ourt has considered the enhancement factors pursuant to the proper Tennessee Code Annotated 40-35-114. And the [c]ourt finds the following enhancement factors, which are not themselves essential elements of the offenses for which the

- 25 -

defendant was convicted. Numbers apply to the subsection of Tennessee Code Annotated 40-35-114. Omitted subjections are found not to apply. Number one, the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. The defendant was driving his vehicle despite having no driver's license, which is criminal activity. He was driving on a suspended license, which is criminal behavior. The defendant has continued his pattern of criminal behavior by filing false liens and committing aggravated forgery while out on bond pending trial. The defendant is currently under indictment for those actions. The [c]ourt not only heard evidence from the Tennessee Bureau of Investigation regarding the indictments rendered against the defendant in Davidson County, Tennessee, but also takes judicial notice of the State's indictments filed against the defendant totaling (sic) over one hundred and thirty-seven million dollars in fraudulent liens and perjury. Admittedly there is no conviction but it is also interesting and also relevant that all of these liens were filed and activities after the crimes were committed on July 4, 2015.

. . .

I meant forgery. The offense involved more than one victim. The [c]ourt finds there were multiple victims in each count. Testimony at trial and victims' impact statements detailed destruction of families, personal suffering and great financial hardship. There were also additional counts that were dismissed to prevent minor victims from having to testify. Each one of the dismissed counts involved additional victims.

Number four. A victim of the offense was particularly vulnerable because of age. In counts three, four, eight and nine the victims were children, in some cases, very young children whose age caused them to be particularly vulnerable. The children were unable to escape the crash and their injuries were much more impactable because of their age.

Number six. The personal injuries inflicted upon or the amount of damage to property sustained or taken from the victims was particularly great. In this particular case, we had a crowded, crowded, very crowded parking lot located in Oak Ridge, Tennessee, in the dark and a fireworks presentation on July 4, 2015. And there were probably hundreds of people in that parking lot. We had 17 counts where people either were aggravatedly assaulted or actually were assaulted or died as a result of the

- 26 -

defendant's actions. There were untold dozens of other people that were in the vicinity of the criminal activity. That is just the beginning of the story.

The [c]ourt recognizes that the personal injuries and death that occurred are subsumed within the charges for which the defendant is sentenced. However, the [c]ourt finds that the multiple victims suffered great property damage to vehicles, incurred large medical bills as a result of the defendant's actions. The victims and their families will likely suffer for many years as a result of the defendant's callous activities.

Number ten. The defendant had no hesitation about committing the crime when the risk to human life was high. The [c]ourt finds that the defendant acted with complete disregard to the risk to human life. In this case the defendant was charged with reckless vehicular homicide. He should thank his Lord Jesus Christ and thank his biblical references for the fact that he wasn't charged with second degree murder. The defendant showed no hesitation in aggressively driving his vehicle intentionally injurying (sic) people in a crowded parking lot. The [c]ourt finds the action of the defendant particularly heinous. Proof at trial showed the defendant had multiple opportunities to end the carnage when he stopped his vehicle and then made a conscious decision to continue his felonious actions until physically forced to stop after striking multiple automobiles, injurying (sic) several people and killing an innocent victim.

Mitigating factors. The [c]ourt has evaluated each potential mitigating factor as outlined in T[ennessee] C[ode] A[nnotated] section 40-35-113. The [c]ourt finds no mitigating factors apply.

The defendant alleges the trial court failed to properly consider the applicable enhancement and mitigating factors. However, as detailed above, the record makes clear the trial court's reasoning regarding the applicable enhancement factors and the lack of applicable mitigating factors. The trial court noted the defendant was driving on a suspended license at the time of his crimes, his crimes subjected many people in addition to his nine named victims to potential injury, the defendant injured four children who were "particularly vulnerable" during his rampage, the defendant's crimes caused both physical and financial hardships to his victims, and the defendant had no hesitation in committing his crimes when the risk to human life was high, as evidenced by the death of Mr. Robinson and the injuries suffered by his other victims. The defendant argues the trial court should have mitigated his sentences, arguing he had no prior criminal record and he was unaware of his actions on July 4, 2015. The trial court, however, carefully

considered the applicability of the mitigating factors before imposing the defendant's sentence, and the defendant has failed to show the trial court abused its discretion for the same. As a result, the defendant is not entitled to relief.

The defendant further challenges the trial court's imposition of consecutive sentencing, arguing no evidence supports the trial court's determination of his dangerous offender status. However, it is wellsettled that the trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *Black*, 924 S.W.2d at 917. Here, the court found one of the statutory criteria existed in the record to warrant consecutive sentencing, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). For reasons stated below, it is clear the statutory criterion is explicit in the record and supports the trial court's imposition of consecutive sentencing.

Before imposing consecutive sentencing for the defendant's nine convictions, the trial court stated:

> Findings on consecutive sentencing. Tennessee Code Annotated 40-35-115 allows consecutive sentencing if the [c]ourt finds, quote, the defendant is a dangerous offender whose behavior indicates little or no regard for human life. And no hesitation about committing a crime in which the risk to human life is high. In the cases of *Gray versus State* and *State versus Taylor*, 1976 and 1987 respectively, the [c]ourt set out a three-pronged test to determine that this criteria was met.
>
> A. The circumstances surrounding the commission of the offense were aggravated. This defendant drove his truck through a very crowded parking lot, a very crowded parking lot, at a high rate of speed, as pronounced by the testimony of the victims. The proof showed he stopped after hitting one car after another and then accelerated again multiple times. He crushed a man to death and injured at least eight other people for which he stands convicted. For which he stands convicted. Several other individuals were in harm's way and were hurt or likely could have been struck[,] injured and killed. This was an aggravated offense. Several counts were dismissed because of the children's tender ages.
>
> B. Confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life; and the defendant's resort to criminal activity in furtherance of an anti-

social lifestyle. This [c]ourt finds that the defendant, Lee Cromwell, has indicated by his statement in the presentence report has little remorse and feels justified in his actions in filing liens against members of the legal community, the court system, the court clerk's office, the district attorney's office, the police department and the judges for what he perceives as unfair actions. The [c]ourt finds that the defendant is unwilling to lead a productive life and extended confinement is necessary to protect society from his criminal actions. He was more worried about his truck than the death of Mr. Robinson.

C. The aggregate length of the sentence reasonably relates to the offense for which the defendant stands convicted. The defendant stands convicted of nine counts. A man was killed by the action of this defendant. Eight other citizens were injured. Four of whom were children under the age of 13. Running these charges concurrently minimizes the injury and suffering of all the parties. The [c]ourt finds that the *Gray* factors have been met; and the [c]ourt finds consecutive sentences are appropriate. That the defendant is a dangerous offender whose behavior indicates little or no regard for human life. The defendant had no hesitation about committing crimes in which the risk for human life was high. The circumstances surrounding the commission of the offenses are aggravated and the aggregate length of the sentences are reasonably related to the offenses for which the defendant stands convicted.

In finding the defendant eligible for consecutive sentencing, the trial court found the defendant drove his truck at a high rate of speed through a crowded parking lot and did not stop after hitting multiple vehicles despite having the chance to do so. The trial court noted the defendant's actions "crushed a man to death" and injured eight others, leaving many others in the parking lot in "harm's way." The record illustrates the defendant showed "little remorse" for his crimes and that he was "more worried about his truck" than his victims, as evidenced by his decision to file liens "for what he perceives as unfair actions" by public officials involved in his prosecution. As a result, the trial court found the defendant to be a dangerous offender and stated his behavior indicated no regard for human life and that he had no hesitation for committing a crime where the risk to human life was high. Accordingly, we conclude the evidence relied upon by the trial court is explicit in the record and supports the trial court's consecutive sentencing as to the defendant's nine convictions. The trial court did not abuse its discretion in imposing consecutive sentences for the convicted offenses, and we affirm the trial court's sentence. Tenn. Code Ann. § 40-35-115.

*IV.    Cumulative Error*

Finally, the defendant contends the cumulative effect of the alleged errors at trial entitled him to a new trial. Pursuant to the cumulative error doctrine, "there may be multiple errors committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings that is so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Here, we discern cumulative error by the trial court does not exist. However, as noted above, the defendant is entitled to a new trial on his convictions for reckless aggravated assault as the trial court erred in instructing the jury on the same.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the conviction and sentence for reckless vehicular homicide, but remand this cause to the trial court for a new trial for the eight charged counts of reckless aggravated assault.

_____
J. ROSS DYER, JUDGE